UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RUFUS WEST,

    Plaintiff,

    v.                                              Case No. 22-cv-178-bhl

JOHN KIND, et al.,

    Defendants.

---

## DECISION AND ORDER

---

Plaintiff Rufus West, who is representing himself, alleges that Defendants John Kind and Michael Cole violated the First, Fourth, and Eighth Amendments, along with the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), when they directed that he (and others) be strip-searched at the Green Bay Correctional Institution on September 10, 2021. Dkt. Nos. 1 & 4. The parties have filed cross-motions for summary judgment. Dkt. Nos. 12 & 14. West has also moved for appointment of counsel. Dkt. No. 31. Because the record confirms that the strip-searches were conducted appropriately in response to a legitimate security concern, and West's rights were not violated, the Court will grant Defendants' motion for summary judgment, deny West's motion for summary judgment, and deny as moot West's motion for appointment of counsel for trial.

### UNDISPUTED FACTS

At the relevant time, West was an inmate at the Green Bay Correctional Institution, where Kind was security director and Cole was a lieutenant. Dkt. No. 16, ¶¶1, 2, & 6. As security director, Kind was responsible for the development, implementation, and monitoring of overall

security, goals, policies, and procedures of the institution, including for the armory, towers, perimeters, program areas, visitation, reception, training, mail, and property. *Id*., ¶3. On September 10, 2021, Kind instructed Cole to have all bathhouse workers, along with their cells, searched for dye. *Id*., ¶14. Kind gave the instruction because grey-colored linens of different shades were circulating throughout the institution, and he believed someone in the bathhouse was attempting to dye linens to match the color of staff clothing to facilitate a possible escape. *Id*., ¶¶7-12. Prison personnel had confiscated blue-colored dye from an inmate's cell a few months earlier, putting Kind on high alert for the possibility that additional dye might be circulating throughout the institution. *Id*., ¶11. Kind explains that dyed linens, especially grey and blue ones, are a security threat because an inmate could attempt to walk out of the institution wearing a color that only staff are allowed to wear. *Id*., ¶¶10 & 12. Toward that end, the prison assigns different colors to different groups: general population linens were supposed to be white; restrictive housing linens orange; kitchen staff clothing grey; and correctional staff clothing blue. *Id*., ¶10. Kind suspected that a bathhouse worker was behind the mysteriously colored linens because bathhouse workers were responsible for exchanging and storing clothing and linen. *Id*., ¶8.

Pursuant to Kind's directive, Cole instructed correctional staff to have all inmate workers in the bathhouse strip-searched. *Id*., ¶15. West was among the inmates covered by the instruction because he was "lead worker" in the bathhouse at the time. *Id*., ¶16. Accordingly, on September 10, 2021, West and three other inmate workers were strip-searched pursuant to Kind's directive and at Cole's instruction. *Id*., ¶15. An unidentified correctional officer performed the strip-search in one of the shower stalls. *Id*., ¶¶21-22. The strip-search was visual, and included a directive to squat and cough, but did not include a cavity search or any physical contact. *Id*., ¶¶19, 22-23.

2

West confirms that it was a visual strip-search, which he describes as including the following directions:

> "Open your mouth. Show me the front and back of your hands. Show me your armpits. Show me behind your ears. Lift your nutsack and penis. Turn around and show me the bottoms of your feet. Bend over and spread your butt cheeks. Squat and cough three times."

Dkt. No. 13, ¶6. West also concedes that no one said or did anything that was unnecessary to the visual strip-search while it was occurring. *See* West Depo., Dkt. No. 18 at 27:24 to 28:6.

No dye was ultimately found during any of the inmate strip-searches or the searches of their cells. Dkt. No. 16, ¶26. In fact, Kind later learned that no dying had taken place at the GBCI bathhouse. *Id*., ¶¶8-9. Instead, members of prison staff informed him that institution personnel had for some time been improperly sending sheets, towels, and pillowcases to Badger Industries (an off-site location) to be dyed either brown or grey. *Id*., ¶27. He also learned that the past three bathhouse sergeants had been improperly ordering old and discolored linens to be dyed through Badger Industries. Dkt. No. 13-1 at 24. The different types of fabrics, all dyed together at the same time, caused different items to come out in different shades of grey during the most recent load. *Id*. at 23. Kind states that he did not know correctional staff had been improperly sending items outside the facility to be dyed until after he directed the strip-searches on September 10. Dkt. No. 16, ¶9.

The record confirms that Kind should have known that dying was taking place at Badger Industries. He was copied on an email explaining staff's involvement in the off-site dyeing process on September 2 (eight days before he ordered the strip-searches). Dkt. No. 13-1 at 24. The September 2 email states:

> "I spoke with Captain Van last week. It is now crystal clear GBCI does not want anything dyed. I understand that. Now. Mr. Koehler you said today to Sgt. Segerstron there is a memo about inmates not having dyed items? No one seems to

> recall it. No blue shirts. Apparently the past 3 bathhouse sergeants never got the memo about it (including myself) because I bet 90% of sheets, towels, and pillowcases in GP are dyed either brown or grey.
>
> If you want to exchange out dyed towels, sheets, and pillowcases for white ones you will need to get me in the ballpark of—3000 sheets, 4000 towels, 2000 pillowcases. And what about the blue blankets we issue? We can't pull these items until I have replacements."

Dkt. No. 13-1 at 24. Unaware of the contents of this email, Kind directed that bathhouse workers be strip-searched to look for potentially stolen dye. *Id*., ¶¶8-9, 14, & 27. Once he realized that staff was having linens dyed off-site, he halted the practice and all previously dyed linens in the institution were replaced with white linens within the next several weeks. *Id*., ¶28.

Three days after being strip-searched, on September 13, 2021, West filed an inmate complaint about the September 10 incident and was then told that staff was looking for dye that had gone "missing" from the bathhouse. Dkt. No. 13, ¶¶8 & 10. West's complaint was dismissed, and he appealed. *Id*., ¶¶11-12. During his appeal, he noted that dye had never been kept in the bathhouse. *Id*. Although someone agreed with his comment that dye was not kept in the bathhouse, his inmate appeal was nevertheless dismissed. *Id*., ¶12.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The party asserting that a fact is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

I. **West's Fourth Amendment Claim Fails Because The Undisputed Facts Show The September 10 Strip-Search Was Reasonable.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. This protection extends to convicted prisoners, but only "in a severely limited way." *Henry v. Hulett*, 969 F.3d 769, 779 (7th Cir. 2020). The Supreme Court has confirmed, as a general matter, that the "Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). But the Seventh Circuit has since held that inmates retain a right to bodily privacy even while incarcerated and may not be subject to unreasonable strip-searches. *Henry*, 969 F.3d at 778-79. This privacy right is "diminished," however, and subject to the reasonable intrusions that the realities of incarceration often demand. *Id*.

In evaluating whether a strip-search is reasonable, the Court must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted. *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). The

5

Court must also be mindful of the prison context and afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 783. "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id*. (internal citations omitted).

Defendants contend that the strip-search conducted on West (and others) on September 10, 2021 was reasonable. They explain that they initiated a strip-search of all bathhouse workers—*not just West*—to look for dye because grey-colored linens of different shades were circulating throughout the institution. From a prison administration perspective, colored linens, especially grey and blue, posed a security threat given that clothing color was the primary means of distinguishing prison staff from inmates. Blue-colored dye had also been confiscated from an inmate's cell in prior months, so Defendants were on high alert for dye at the time. Given that linens are stored in the bathhouse, Defendants contend they reasonably (although ultimately incorrectly) suspected that someone in the bathhouse may have been responsible for dyeing the linens. Based on this suspicion, they ordered searches limited to the individuals who worked in the bathhouse and their cells. In compliance with this order, West and his co-workers were given a standard visual strip-search conducted in a private shower stall. West further concedes that no one said or did anything unnecessary to the visual strip-search. *See* West Depo., Dkt. No. 18 at 27:24 to 28:6.

Defendants have demonstrated that the search was reasonable in scope, manner, justification, and place. The strip-searches were limited to bathhouse employees, whom prison officials had reason to believe might be the source of the suspected contraband dye. The searches

were conducted in a reasonable manner, consisting of mere visible searches, not cavity searches and without physical touching, as minimally necessary to search for the suspected dye. Defendants have also explained the justification for the searches – to maintain prison security by controlling the color of linens. Finally, the strip-searches took place in a private shower stall, shielded from unnecessary viewing or spectacle. The search did not involve a more intrusive cavity search or even physical contact by the guards. Under *Henry*, Defendants directed the strip-search in a reasonable way, consistent with West's diminished expectations of privacy and given the realities of incarceration.

West's summary judgment papers emphasize repeatedly that Defendants' justification for the strip-searches was based on their erroneous belief that dye was missing from the bathhouse. Dkt. Nos. 12, 13, 32, 33, & 34. West points to documents showing that the security threat actually arose from dyed sheets that prison personnel's practice of having old linens dyed in bulk off-site, not from prisoners stealing dye and using it to alter the color of their linens. Dkt. No. 13-1. He also points to documents showing personnel arranging for the offsite dyeing nearly a year before Defendants ordered the strip-searches. *Id*. at 19-20. And he relies on an email from the bathhouse sergeant to Kind and others dated September 2, 2021 – eight days before the strip-search – explaining that linens had long been sent offsite for dyeing and that 90% of the sheets, towels and pillowcases in the institution had been dyed either brown or gray. *See* Dkt. No. 35 at 2; *see also* Dkt. No. 13-1 at 24. Consistent with this documentary evidence, West reports that colored linens have always been available at the institution and dye has never been kept in the bathhouse. Dkt. No. 13, ¶¶30-32. He thus calls Defendants' suspicion that inmates were stealing dye and altering the color of linens "ludicrous." Dkt. No. 35 at 3.

7

These arguments miss the point. That Defendants' initial suspicions proved factually incorrect does not render the search unreasonable. Defendants initiated the searches based on a legitimate security threat and to advance the institution's understandable desire to maintain separate colors for linens and clothing between prisoners and staff. And West does not suggest that the threat to security was not real. West simply faults prison officials for being mistaken in their suspicions and for not communicating better with correctional staff. While West's critique of the communication between Defendants and other staff at the institution is not without merit, this criticism does not render the decision to search all bathhouse workers unreasonable. That coordination and communication within the prison left something to be desired is hardly surprising in such a large bureaucracy and does not mean that Defendants' decision to investigate the inmates in the bathhouse was unreasonable. Because the circulation of different colored linens undisputedly created a genuine security risk, Defendants were justified in addressing that risk through targeted searches of the inmates likely to be involved, including visual strip-searches of the inmates and searches of their cells. Indeed, the entire purpose of an investigation is to determine whether a security threat exists and how serious it may be. In this case, the searches did not turn up contraband dye and it ultimately turned out that the dyed linens causing a security concern were the result of actions by prison employees, not prisoners. These ultimate conclusions do not render Defendants' earlier decision to investigate invalid in the first place. Defendants' decision to promptly search for dye, when an inmate had been found in possession of dye in the recent past, and when mysteriously colored linens were suddenly circulating the institution, was reasonable under the circumstances. Preventing inmate escape is an ever-present and legitimate security concern, *see e.g., Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984), and the Court will not second guess prison officials' expert judgment to handle such matters swiftly. *See e.g., Lindell*

*v. Cushing*, No. 19-C-704, 2022 WL 901560, at *4 (E.D. Wis. Mar. 28, 2022) (noting that it is not the Court's prerogative to "second guess" correctional staff decisions regarding strip-searches when they have articulated legitimate security concerns).

West also complains that Defendants are offering a different factual explanation than the one the institution used in rejecting his inmate complaint and dismissing his appeal of that decision. During his exhaustion proceedings, the institution justified the strip-search on grounds that dye was "missing" from the bathhouse. Dkt. No. 32 at 4-5. He notes that Defendants now acknowledge that dye was not actually missing and are offering a different reason for the strip-search—that they were allegedly looking for dye that inmates were not supposed to have. *Id*. West asks the Court to bar Defendants from making arguments justifying the strip-search on any basis other than what they asserted in the exhaustion documents (the "missing dye"). *Id*. He also claims he has been "prejudiced" by the inability to conduct discovery on Defendants' "new" explanation for the strip-search. *Id*.

West misunderstands the grievance process and the difference between that process and a federal lawsuit. During the exhaustion process, an inmate is required to identify the basis for his complaint so that the institution has notice of his grievance. *Price v. Friedrich*, 816 F. App'x 8, 10 (7th Cir. 2020) (citing *Schillinger v. Kiley*, 954 F.3d 990, 995-96 (7th Cir. 2020)). Accordingly, an inmate must allege enough facts in the inmate complaint to allow the institution to investigate the grievance and attempt to resolve any underlying issues. *Id*. The institution, on the other hand, has no obligation to give inmates notice of potential legal defenses that might be applicable in a later lawsuit. As the Seventh Circuit has explained, "[t]he exhaustion requirement protects the prison's administrative authority by giving it an opportunity to correct its own mistakes before suit is filed against it in federal court." *Schillinger,* 954 F.3d at 995 (citing *Woodford v. Ngo*, 548 U.S.

9

81, 89 (2006)). Moreover, the institution is not a defendant in this lawsuit. Nothing the institution did in resolving West's inmate complaint hamstrings Defendants in this case from pursuing any valid legal or factual defenses they have to West's claims. West cites *Jones v. Bock* in support of his argument that *he* is entitled to notice through the exhaustion process, but that case says nothing about any obligation Defendants have to provide him notice of their legal defenses and instead confirms the intent of the Prison Litigation Reform Act to "account for an outsized share of filings" in federal district courts by "filter[ing] out the bad claims and facilitate consideration of the good." 549 U.S. 199, 203-04 (2007).

The Court also rejects West's suggestion that he was hampered in discovery by the justification Defendants now offer. The law permits an inmate unhappy with the resolution of his inmate complaint to file a lawsuit in federal court. Once in court, defendants have the right to argue facts in defense of the claims asserted and to identify *affirmative defenses* (such as an inmate's failure to exhaust administrative remedies) in their answer. *See* Fed. R. Civ. P. 8(c). While pleadings certainly help provide adequate notice of issues to investigate through discovery, the defense at issue here—the justification for the strip-search—is not an "affirmative defense" that Defendants needed to raise specifically in their answer. It is a factual defense to the unreasonableness of the search that West himself alleges. Defendants are entitled to introduce evidence and make arguments relevant to the reasonableness of the strip-search and that is exactly what they have done. West is not unfairly prejudiced by the Defendants explaining the reasons for their strip-search directives. Moreover, West's claim of prejudice is undercut by the Court's screening order, which explained that the justification for initiating the strip-search was a relevant piece of information in analyzing its reasonableness. *See* Dkt. No. 4. West therefore had ample

10

notice and opportunity to ask Defendants why they initiated the strip-search during discovery. If he failed to do so (and the record suggests he certainly did not), it would be his own fault anyway.

Indeed, any change to Defendants' story between the exhaustion documents and summary judgment is in any event not material. Defendants have always maintained that they were looking for contraband, i.e., dye that inmates were not supposed to have. Whether that dye belonged to the institution and was stolen by the inmates or whether it was improperly brought into the institution by an inmate does not discredit Defendants' explanation for why they initiated the strip-search—to look for contraband dye. And their reason for initiating the searches remains undisputed.

Finally, West speculates that Defendants must have already known that colored linens were available at the institution; and therefore, he suggests, Kind ordered, and Cole implemented, the strip-searches as a pretext to humiliate and/or harass him for his religion. In response, Kind insists that prison policy prohibits colored linens for security reasons, and he explains that he did not know staff were responsible for failing to follow prison policy at the time he ordered the strip-searches. He further states that he had not yet been intimately involved in the details of that particular process regarding property at the time he ordered the strip-searches. The September 2 email on which he was copied shows that someone attempted to explain the circumstances to him eight days before he ordered the strip-searches on September 10. But Kind swears that he was not aware of the circumstances at the time he ordered the strip-searches. Given this sworn testimony, and the undisputed fact that West was not singled out—all bathhouse workers were subject to the search—West's speculation that Kind used the strip-search as a pretext to humiliate and/or harass him for his religion is not enough to create a genuine issue of fact sufficient to survive summary judgment. *See Weaver v. Champion Petfoods USA Inc.,* 3 F.4th 927, 936 (7th Cir. 2021) ("A party

must present more than mere speculation or conjecture to defeat a summary judgment motion."). Stated differently, in light of the other undisputed evidence on the record showing the institution's legitimate security concern, one email on which Kind was copied (which it appears he failed to read) does not amount to the "substantial evidence" required for the Court to side-step the wide-ranging deference it must give to prison officials' expert judgment regarding prison security. West's Fourth Amendment claim therefore fails.

## II. West's Eighth Amendment Claim Fails Because There Is No Evidence That Defendants Had an Intent To "Punish" Him.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. Amend. IIX. With respect to prison strip-searches, the Eighth Amendment safeguards prisoners against strip-searches that are subjectively intended as a form of "punishment." *Henry*, 969 F.3d at 781. To survive summary judgment on an Eighth Amendment claim, West must provide evidence from which a reasonable jury could conclude that correctional officers conducted a strip-search that was "motivated by a desire to harass or humiliate" or "intended to humiliate and cause psychological pain." *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015).

As detailed above, Defendants have offered a legitimate justification for strip-searching West and the other bathhouse employees under the Fourth Amendment. This conclusion alone precludes a finding of Eighth Amendment liability. *See e.g., Johnson v. Uherka*, No. 22-2589, 2023 WL 3581963, at *2 (7th Cir. May 22, 2023) (affirming a district court's dismissal of an Eighth Amendment claim because Defendants had offered a legitimate justification for the strip-search under the Fourth Amendment).

Moreover, West's assertion that Defendants ordered and implemented the strip-search for the purpose of harassing and/or humiliating him due to his religion is entirely speculative. He offers no evidence that either Defendant had any animus against him based on his religious views

or otherwise. His unsupported conjecture is insufficient to survive summary judgment. *See Weaver,* 3 F.4th at 936. Indeed, contrary to West's suggestion, the undisputed evidence shows that Kind ordered *all* bathhouse workers to be searched for dye that day. West, along with three other inmates whose religion is unknown, were searched. There is no evidence on the record showing that either Kind or Cole ordered the strip-searches because of West's religion or that they specifically targeted him for the purpose of harassing and/or humiliating him due to his religion. West's conclusory allegations otherwise are not enough to survive summary judgment.

### III. West's First Amendment Claim Fails Because The Undisputed Facts Show That Defendants' Conduct Was Reasonably Related To A Legitimate Governmental Interest.

The First Amendment protects an inmate's exercise of his religious beliefs, although the right is "not unfettered." *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009). As long as prison officials' actions are reasonably related to "a legitimate penological interest," including prison security, they may restrict an inmate's ability to practice his faith. *Id*. The Seventh Circuit has identified four factors for evaluating the constitutionality of prison restrictions: (1) whether the restriction "is rationally related to a legitimate and neutral governmental objective;" (2) "whether there are alternative means of exercising the right that remain open to the inmate;" (3) "what impact an accommodation of the asserted right will have on guards and other inmates;" and (4) "whether there are obvious alternatives to the [restriction] that show that it is an exaggerated response to [penological] concerns." *Lindell v. Frank,* 377 F.3d 655, 657 (7th Cir. 2004) (citing *Turner v. Safley,* 482 U.S. 78, 89–91 (1987)).

The undisputed facts show that West's strip-search was reasonably related to a legitimate security concern. As discussed in the sections above, Defendants were looking for dye because they believed someone in the bathhouse was responsible for improperly dyeing linens to facilitate

13

a possible escape. Defendants exercised their judgment as prison administrators to handle the matter swiftly, they searched only bathhouse workers (the individuals responsible for handling linens), and they limited the search to a standard visual strip-search (the least intrusive form of a strip-search).

West has not established that there was any alternative that would have permitted him to exercise his religious beliefs consistent with the prison's need to investigate this legitimate security need. He does not allege that his ability to practice his religion was hindered in any other way. Indeed, he acknowledges that his religion does not entitle him to a blanket exemption from strip-searches. Dkt. No. 12 at 3 ("Being in prison, [I] am not arguing that [I] should not be strip-searched per se.").

Any accommodation of West would undermine the ability of guards to maintain prison security and prevent escapes. West's suggestion that he be exempted from strip-searches that are "unjustified" (in hindsight) is unworkable. *Id*. Such a ruling would render searches for contraband meaningless as West could object any time he was strip-searched and call it "unjustified" given his religious beliefs concerning strip-searches.

Because the circumstances show a strip-search was justified, giving deference to the judgment of prison officials, the search was conducted in a normal fashion, and was not targeted based on West's religious views, his First Amendment claim fails.

## IV. West's RLUIPA Claim Fails Because a Visual Strip-Search Was the Least Restrictive Means Of Searching West For Contraband.

RLUIPA provides that a federal prison may not substantially burden an inmate's exercise of his religion unless it can prove that doing so "is the least restrictive means of furthering a compelling governmental interest." *See* 42 U.S.C. §2000cc(a). "A prisoner whose religious exercise has been burdened in violation of the statute may sue for injunctive or declaratory relief."

14

*West v. Radtke*, 48 F.4th 836, 844 (7th Cir. 2022) (citing *Charles v. Verhagen*, 348 F.3d 601, 606 (7th Cir. 2003)). To survive summary judgment on his RLUIPA claim, West bears the initial burden of proving that Defendants substantially burdened a sincerely held religious belief. *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (citing *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 717 (2014)). "These are 'factual inquiries within the court's authority and competence' that are 'important to weed out sham claims.'" *West*, 48 F.4th at 847 (quoting *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013)). The burden then shifts to Defendants to show that their conduct was the least restrictive means of furthering a compelling governmental interest. *Hobbs*, 574 U.S. at 362.

The Court will assume that West holds sincere religious beliefs that are affected by requiring him to expose himself during a strip-search.[1] West states that the September 10 strip-search substantially burdened his religion because "exposing his nakedness to anyone who is not his wife [is] inconsistent with his Islamic beliefs." Dkt. No. 12 at 4. But West clarifies that he is not seeking a general religion-based exemption from strip-searches, he simply maintains that submitting to an *unjustified* strip-search violates his religion. *Id*. at 3-4. In other words, West appears to argue that any strip-search that violates the Fourth and/or Eighth Amendment also substantially burdens his religion because he is Muslim. But, as explained above, the strip-search at issue did not violate the Fourth or Eighth Amendments. The search was justified based on legitimate security concerns.

---

[1] In a different case involving West, the Seventh Circuit recently held, "[r]equiring West to submit to cross-sex strip-searches substantially burdens his religious exercise by forcing him to either violate his religious duties or be disciplined." *West*, 48 F.4th at 847. The Court discussed the "nudity prohibition" of West's religion, i.e., that all strip-searches—even those by male guards—allegedly violated his religion. *Id*. at 846-47. But the Seventh Circuit limited the holding of the case to cross-sex strip-searches. *Id*. at 847.

15

Defendants have also met their burden to show that their conduct was the least restrictive means of furthering a compelling governmental interest. The Supreme Court has recognized that "staunching the flow of contraband" is a compelling governmental interest in the prison setting. *Holt*, 574 U.S. at 363. Indeed, "context matters," *see Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005), and "courts should not blind themselves to the fact that the analysis is conducted in the prison setting." *Hobbs*, 574 U.S. at 369; *see also Cutter*, 544 U.S. at 722 ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."). Defendants have explained how a visual strip-search is the least intrusive form of a body search for contraband, unlike an assisted strip-search or a cavity search, both of which involve more intrusive physical touching by correctional staff. Here, Defendants imposed a visual strip-search of West for the purpose of locating contraband (dye) that he may have hidden on his person. Staff only looked for contraband while West manipulated his own body. West has not suggested any reasonable and less restrictive means of accomplishing the prison's goal. He simply proposes that Defendants refrain from conducting a strip-search whenever he believes it is "unjustified." Conditioning the propriety of a strip-search on an inmate's determination of whether it is justified is a non-starter. It would compromise institution security by giving West veto power over guards' ability to conduct strip-searches. This would undercut prison security and give inmates the ability to hide contraband on their persons only to then object to, or delay execution of, a strip-search under the guise of religious beliefs. Because prison personnel had legitimate security concerns and conducted a targeted, but limited search, on prisoners who they reasonably believed were likely to have contraband, the strip-search was proper.

Moreover, and in any event, West's RLUIPA claims fail for other reasons. First, the statute limits West to only injunctive relief. *See West v. Grams*, 607 F. App'x 561, 566 (7th Cir. 2015)

("Under RLUIPA the remedy available to West was limited to declaratory or injunctive relief."). Although West requested injunctive relief in his complaint, at summary judgment, he has only presented facts related to a single completed incident on September 10. He has not shown any possibility, let alone likelihood, of additional strip-searches related to the dyed-linens issue. His request for injunctive relief is therefore moot. *See Thompson v. Bukowski*, 812 F. App'x 360, 364 (7th Cir. 2020) (noting that relief under RLUIPA is moot when an inmate fails to establish that he is "likely" to be exposed to the violation again).

Further, his request that the Court "enjoin the defendants from conducting strip-searches when they know that there is no justification for them," *see* Dkt. No. 1 at 3, is improperly vague. The Court cannot issue an injunction for the sole purpose of ordering Defendants to "follow the law" and only conduct searches that are "justified." *See e.g., Henson v. Neal*, No. 3:19-CV-396-JD-MGG, 2021 WL 9782707, at *2 (N.D. Ind. Dec. 29, 2021) ("A general injunction against 'retaliation' is too vague."). Such an injunction would be impossible to enforce. *See Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412, 415-16 (7th Cir. 2008) (vacating an injunction awarded by the district court because the order "requires a lot of guesswork on [defendant's] part in order to determine if it is engaging in activities that violate the injunction"); *see also Johnson v. Lashbrook*, No. 16-CV-637-MJR-SCW, 2017 WL 958509, at *2 (S.D. Ill. Mar. 13, 2017) (noting that an injunction "must clearly indicate what it is the defendant is to do or not do.").

Defendants have met their burden under RLUIPA and are therefore also entitled to summary judgment on the RLUIPA claim.

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendants' motion for

summary judgment (Dkt. No. 14) is **GRANTED**; Plaintiff's motion for summary judgment (Dkt. No. 12) is **DENIED**; Plaintiff's motion for appointment of counsel (Dkt. No. 31) is **DENIED** as moot, and this case is **DISMISSED**. The Clerk's office is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on September 29, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.